UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

CHARLOTTE ANN HARRINGTON         CIVIL ACTION NO.  6:23-CV-00335

VERSUS                           JUDGE ROBERT R. SUMMERHAYS

COMMISSIONER OF SOCIAL           MAGISTRATE JUDGE DAVID J. AYO
SECURITY

**REPORT AND RECOMMENDATION**

Before the Court is an appeal by Claimant Charlotte Ann Harrington of the Commissioner's finding of non-disability.   The Court has considered the administrative record, the parties' briefs, and the applicable law, and recommends that the Commissioner's decision be vacated and remanded to the Commissioner for further proceedings consistent with the views expressed herein.

**Administrative Proceedings**

Claimant fully exhausted her administrative remedies before filing this action. She filed an application for supplemental security income on October 10, 2019, alleging disability beginning on September 10, 2019.  (Rec. Doc. 9-1, pp. 163-172). Her application was denied initially on May 5, 2020 (Rec. Doc. 9-1, p. 70) and upon reconsideration (Rec. Doc. 8-1, p. 85).  Claimant then requested a hearing, which was held by telephone due to the "extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) pandemic" before Administrative Law Judge Steven Rachal. (Rec. Doc. 9-1, p. 28 *et seq*).  The ALJ issued a decision on September 22, 2022, concluding that based on the application for supplemental security income filed on October 10, 2019, Claimant is not disabled under section 1614(a)(3)(A) of the Social

Security Act. (Rec. Doc. 9-1, pp. 16-2).  Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 9-1, p. 4).  Therefore, the ALJ's decision became the Commissioner's final decision for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).  Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on July 19, 1968.  She was 51 years old on the alleged disability onset date and 54 years old at the time of the ALJ's decision.  She completed the seventh grade, attended special education classes from 1980-1981, and dropped out of school in the eighth grade. (Rec. Doc. 9-1, pp. 36, 210).  Her work history includes employment as an animal control officer.  (Rec. Doc. 9-1, pp. 37, 210).  She alleged that she has been disabled since September 10, 2019, due to back problems and resulting pain, knee problems and resulting pain, heart problems, and a history of 97% stent blockage, asthma, high blood pressure, high cholesterol, and thyroid disorder.  (Rec. Doc. 9-1, p. 210).

The record reveals the following pertinent[1] history:

---

[1]  The Court has not included medical records regarding Claimant's "heart problems and a history of 97% stent blockage, asthma, high blood pressure, high cholesterol, and a thyroid disorder" as the ALJ found Claimant's "impairments of hypertension and chronic obstructive pulmonary disease (COPD) are not severe, as medications appear to control any symptoms, and they cause no more than minimal limitations in the ability to perform work activity. Additionally, treatment records indicated that these conditions, to include her coronary artery disease were resolved (Exhibit 6F/5). The State agency consultants agreed that these conditions were not severe (Exhibit 1A).  As such, these conditions are not severe." (Rec. Doc. 9-1, p.18).  Claimant did not appeal these findings.

I.    **Claimant's Medical Records:**

A.  <u>St. Landry Family Healthcare – Washington, Louisiana (before back surgery)</u>:
  - <u>August 30, 2018</u> – Claimant sought treatment for hypertension with dizziness, ear pain, chest congestion, sinus congestion, wheezing, sore throat, chronic and worsening lower back pain with movement including radicular pain in the right arm and right leg.  FNP Elliot Myers noted Claimant was tender at lumbar spine, decreased intermittent rotation, and radiculopathy to bilateral legs as well as decreased extinction to bilateral toes.  He ordered an MRI of the Lumbar Spine, and prescribed muscle relaxers, Gabapentin, and anti-inflammatory medications and medication for sinusitis symptoms.  (Rec. Doc. 9-1, pp. 341-358).
  - <u>December 19, 2018</u> – FNP Myers prescribed a walking cane.  (Rec. Doc. 9-1, pp. 680).
  - <u>February 8, 2019</u> – FNP Myers sent referral letters to Dr. Rubino regarding Claimant's acute, chronic, constant, stabbing, and radiating back pain in the right lower back area and lumbar spine.  He noted her diagnoses of bilateral lumbago with sciatica, lumbar radiculopathy, and spondylolisthesis and reported that medication, physical therapy, and physical therapy acupuncture worsened pain.  (Rec. Doc. 9-1, pp. 630-636).
  - <u>July 12, 2019</u> – Claimant sought treatment for sinusitis.  FNP Myers noted Claimant has severe degenerative disc disease with bilateral foraminal narrowing with annular bulge per a February 19, 2019 MRI and was scheduled for surgery.  (Rec. Doc. 9-1, p. 686).

B.  <u>Opelousas General Health System – Opelousas, Louisiana (before back surgery)</u>:
  - <u>November 28, 2018</u> – Claimant sought physical therapy for back pain.  The physical therapist noted that Claimant continued to "ambulate with an antalgic gait with single cane support." (Rec. Doc. 533).
  - <u>February 6, 2019</u> – Claimant obtained a Magnetic Resonance Imaging (MRI) scan which showed severe bilateral degenerative changes at L5-S1 with bilateral neural foraminal narrowing. (Rec. Doc. 9-1, pp. 265, 317).

C.  <u>Lake Charles Memorial Health System – Lake Charles, Louisiana (before, during, and after back surgery)</u>:
  - <u>June 4, 2019</u> – Claimant sought treatment for low back pain lasting over a year.  She complained of sharp, stabbing pain rated as a 9 or 10 out of 10 with radiation into her right leg and toes, numbness, and

tingling. Nurse Practitioner Lisa Rubino noted that Claimant was in a formal physical therapy program which did not relieve her pain, that Gabapentin provided some relief from the pain, and that Claimant was "walking with a cane because she feels her legs give out on her." NP Rubino prescribed pain medication, a muscle relaxer, and ordered a bilateral electromyographic (EMG) study. (Rec. Doc. 9-1, pp. 263-266).

- <u>June 13, 2019</u> – Claimant obtained an EMG which showed "[a]symmetrically prolonged right H-reflex latency, chronic neurogenic changes in the right S1 myotome, chronic right radiculopathy," and "no electrophysiologic evidence of superimposed polyneuropathy or entrapment neuropathy." (Rec. Doc. 9-1, p273, 274).

- <u>July 8, 2019</u> – Claimant sought follow-up appointment at Dr. Gregory Rubino's office and was treated by NP Rubino who noted that the EMG performed by Dr. Best revealed chronic right S1 radiculopathy and that neither Flexeril nor Gabapentin relieved Claimant's pain. Dr. Rubino suggested surgery to stabilize the L5-S1 level and that Claimant consult a cardiologist to determine whether she could undergo general anesthesia due to her stent. (Rec. Doc. 9-1, pp. 261-262).

- <u>September 10, 2019</u> – Dr. Rubino performed L5-S1 right-sided complete facetectomy, decompression of the nerve root, diskectomy of L5-S1with interbody fusion using structural pedicle screw fixation, intraoperative fluoroscopy, microscopy, o-arm navigation, and nerve monitoring after diagnosis of L5-S1 degenerative disk disease causing right S1 radiculopathy. He reported no complications, and that Claimant was discharged in good condition. (Rec. Doc. 9-1, pp. 243-257).

- <u>September 18, 2019, October 30, 2019</u> – Claimant sought follow-up appointments following surgery. Dr. Rubino noted that her low back pain and right leg pain had improved and diagnosed thoracic, thoracolumbar, lumbosacral disc disorder, intervertebral disc disorder with radiculopathy in the lumbar region and low back pain. Claimant reported difficulty finding transportation to appointments, and the next appointment was scheduled for July 2020. (Rec. Doc. 9-1, pp. 257-260).

- <u>December 7, 2020</u> – Computerized tomography of the lumbar spine, (ordered by Dr. Rubino due to Claimant's back pain) demonstrated postoperative changes, spondylotic disc and endplate changes, and facet arthropathy. (Rec. Doc. 9-1, 825, 826).

<u>D. St. Landry Family Healthcare (after back surgery) – Washington, Louisiana</u>:

- <u>December 3, 2019</u> – Claimant sought treatment for knee pain and swelling after falling in hole. FNP Myers prescribed a knee brace and tramadol and referred Claimant to an undisclosed doctor for the knee pain. (Rec. Doc. 9-1, pp. 637-641, 689-690).
- <u>March 3, 2020</u> – Claimant sought treatment for continued knee pain and swelling. FNP Lauren Jarrell noted instability, limping, locking, pain with movement, stiffness, swelling, warmth, and weakness. She drained Claimant's knee and injected it with lidocaine. (Rec. Doc. 9-1, pp. 695-696).
- <u>May 11, 2020</u> – Claimant sought treatment via telephone due to COVID-19 for continued knee pain and swelling. FNP Lauren Jarrell noted that Claimant should elevate the knee, use a knee sleeve when walking, and to continue use of cane for safety. (Rec. Doc. 9-1, p. 698).
- <u>May 20, 2020</u> – FNP Jarrell referred Claimant to an orthopedic clinic for Claimant's knee pain. (Rec. Doc. 9-1, p. 700).
- <u>May 21, 2020</u> – Claimant sought treatment via telephone due to COVID-19 for continued knee pain and swelling. FNP Myers prescribed Norco, meloxicam, and requested Claimant visit in-person once respiratory issues were resolved to re-inject and drain knee if warranted. (Rec. Doc. 9-1, pp. 702, 703).
- <u>July 2, 2020</u> – Claimant sought treatment via telephone due to COVID-19 for continued and worsening knee pain and swelling. FNP Jarrell prescribed meloxicam and referred Claimant to an orthopedist. (Rec. Doc. 9-1, pp. 707, 708).
- <u>August 5, 2020</u> – Claimant sought treatment for continued knee pain and swelling. FNP Jarrell noted Claimant had been complaining of knee pain for months, has no relief with knee brace, and that her last x-ray in February 2020 showed degeneration. She drained Claimant's knee and injected it with lidocaine. (Rec. Doc. 9-1, pp. 610-711).
- <u>May 27, 2021</u> – Claimant sought treatment for right leg pain and swelling after falling while chasing a chicken two weeks prior. FNP Alivia Fontenot diagnosed a right hamstring tear and prescribed Flexeril and "Norco for this time only." (Rec. Doc. 9-1, pp. 719-720).
- <u>August 5, 2021</u> – Claimant sought treatment for hernia post fall two months prior and heel pain. FNP Olivia Smith noted hamstring tear, ordered physical therapy, and prescribed Toradol. (Rec. Doc. 9-1, pp. 725-726).
- <u>December 6, 2021</u> – Claimant sought treatment for left knee pain at a 9 out of 10, swelling, stiffness, and popping when she walks. FNP Smith noted swelling, weakness, small effusion, crepitus, and weakness in the left knee and prescribed Mobic. (Rec. Doc. 9-1, pp. 728-729).

- <u>March 22, 2022</u> – Claimant sought follow-treatment for hypertension and complained of left knee pain.  FNP Smith noted that Claimant "uses a cane to ambulate" and takes Gabapentin.  She ordered x-rays and prescribed Toradol. (Rec. Doc. 9-1, pp. 731-732).

E. <u>Opelousas General Health System – Opelousas, Louisiana (after back surgery)</u>:
- <u>August 19, 2020, September 22, 2020, October 1, 2020, October 7, 2020, October 15, 2020</u> – Claimant sought physical therapy for knee pain.  The records reveal many missed appointments due to transportation issues. (Rec. Doc. 9-1, pp. 388-428).
- <u>November 3 and 11, 2020</u> – Claimant requested to be discharged from physical therapy due to back pain and a "knot in her back."  She scheduled appointment with her back doctor on November 10, 2022. (Rec. Doc. 9-1, p. 428).
- <u>April 29, 2021</u> – Claimant sought treatment in emergency room for lower extremity pain and swelling.  Swelling was noted and Mobic and Flexeril were prescribed. (Rec. Doc. 9-1, pp. 760-766).
- <u>May 16, 2021</u> – Claimant sought treatment in emergency room for right leg pain after falling in mud two days prior.  She was diagnosed with a hamstring strain and contusion.  A CT and wheelchair were ordered, and Norco was prescribed. (Rec. Doc. 9-1, pp. 766-775).
- <u>June 16, 2022</u> – Claimant sought treatment in emergency room for left ankle injury following a fall.  She was ambulating on crutches and was diagnosed with an avulsion fracture of the distal fibula hamstring strain and contusion.  Hydrocodone-acetaminophen was prescribed. (Rec. Doc. 9-1, pp. 766-775).

F. <u>Advanced Orthopedics and Sports Medicine – Mansura, Louisiana</u>:
- <u>August 12, 2020</u> – Claimant was referred by her primary care physician to FNP Carrie Ormsby for evaluation of knee pain which she rated as a 9 out of 10, gait instability, joint swelling, and the knee giving way.  She reported that the pain had lasted for a year.  FNP Ormsby ordered a knee brace, physical therapy at Opelousas General Health South Campus, a steroid intra-articular injection, additional x-rays, and diagnosed knee arthritis.   (Rec. Doc. 9-1, pp. 766-775).
- <u>August 31, 2020</u> – Claimant sought follow-up appointment with FNP Ormsby.  She reported constant pain and swelling of the knee at a 10 out of 10 in intensity.   FNP Ormsby gave her a booster steroid injection, ordered a different brace to provide more relief, asked her to repeat her x-rays as the technician was unable to get a standing view, and increased her prescription of Mobic. (Rec. Doc. 9-1, pp. 805, 806).
- <u>September 23, 2020</u> – Claimant sought follow-up appointment

treatment with FNP Ormsby. She reported constant pain and swelling of the knee at a 10 out of 10 in intensity. FNP Ormsby reported that the x-rays of her knees showed arthritic changes at the lateral aspect of the left knee patella and good joint space, and she diagnosed bilateral varus deformity. She noted that Claimant was also under Dr. Rubino's care for an L5-S1 fusion in September 2019, ordered testing for gout and that Claimant continue physical therapy. (Rec. Doc. 9-1, pp. 801, 802).

- October 14, 2020 – Claimant sought follow-up appointment treatment with FNP Ormsby. She reported constant pain and swelling of the knee at a 10 out of 10 in intensity. FNP Ormsby reported that Claimant missed several physical therapy appointments due to Hurricane Laura but completed six sessions. She also missed her follow-up appointment with Dr. Rubino but planned to reschedule the appointment. She reported that Dr. Rubino confirmed that she had nerve damage in her left lower extremity. FNP Ormsby refilled her prescriptions of Gabapentin, cyclobenzaprine and meloxicam, and prescribed Cymbalta. (Rec. Doc. 9-1, pp. 800, 801).

- November 10, 2020 – Claimant sought follow-up appointment treatment with FNP Ormsby. She reported knee pain at a 9 out of 10 and interior lumbar spine pain at a 6 out of 10. Claimant reported that she could not continue physical therapy in her knee due to spine pain and that she did not follow-up with her CT scan of her spine as ordered by Dr. Rubino due to Hurricane Laura. FNP Ormsby dispensed a back brace and diagnosed lumbar radiculopathy, Type II diabetes, and unilateral primary osteoarthritis of the left knee. (Rec. Doc. 9-1, pp. 800, 801).

- December 10, 2020 – Claimant sought follow-up appointment treatment with FNP Ormsby. She reported knee pain at an 8 out of 10. She reported that a CT of her lumbar spine was taken and that she would review the results at an appointment with Dr. Rubino on December 23, 2020. FNP Ormsby noted that the back brace was effective, that recent x-rays were consistent with bilateral knee osteoarthritis, instability, and varus, and requested authorization for a different left knee brace. (Rec. Doc. 9-1, pp. 795,796).

- January 7, 2021 – Claimant sought follow-up appointment treatment with FNP Ormsby. She reported knee pain at a 10 out of 10. She reported that a CT of her lumbar spine was scheduled for January 27, 2021, and that she would follow-up with Dr. Rubino. FNP Ormsby dispensed an L1851 knee brace and suggested the same brace for the right knee. She also refilled Claimant's Cymbalta prescription. (Rec. Doc. 9-1, pp. 793,794).

## II.    <u>State Agency Consultant</u>

On May 5, 2020, after reviewing medical records from Dr. Rubino, St. Landry Family Healthcare, and Lake Charles Memorial Hospital, the state agency medical consultant Dr. Emily Eisenhauer determined that Claimant was not disabled and found Claimant capable of light work.  She noted that there "is no indication that there is a medical opinion from any medical source" and stated:

> The medical evidence shows that while you have limitations to your ability to work related to back and knee problems, you are still able to perform work that does not require extended standing and walking…
>
> Your condition results in some limitations in your ability to perform work related activities. We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information, your age and education in determining how your condition affects your ability to work. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work.  However, based on the evidence in file, we have determined that you can adjust to other work.

(Rec. Doc. 9-1, pp. 62-65).

## III.    <u>Testimony at August 9, 2022 telephone hearing before the ALJ</u>

Claimant testified that she stopped working because of her back pain—which has improved since her surgery in 2019—and because of her left knee pain and left side nerve damage.  (Rec. Doc. 9-1, pp. 42, 43).  She further stated that she is unable to walk or stand for more than five to ten minutes, that her knee gives out at least three or four days of the week, and that she has fallen "at least four or five times this year" with one of the falls resulting in a hamstring tear and another resulting in a broken foot.  (Rec. Doc. 9-1, 42. 44, 45, 46, 49).  She further testified that she has worn

a hinged brace on her knee since September of 2020, that she has been treated with steroid injections in her knee, and that she continues to take Gabapentin for pain. (Rec. Doc. 9-1, at p. 42-45).

The ALJ found Claimant was not disabled. Claimant now seeks reversal of the Commissioner's adverse ruling.

## Discussion

### A.    Standard of Review

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted). The Supreme Court has emphasized that:

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means— and means only— "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, (2019) (internal citations omitted). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. *Joubert v. Astrue*, 287 F. App'x 380, 382 (5th Cir.

2008) (citing *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983).  In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – unless the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

Four elements of proof are weighed in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the Claimant's subjective evidence of pain and disability, and (4) the Claimant's age, education, and work

experience. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

### B.    Entitlement to Benefits

Supplemental Security Income (SSI) provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2). *See also Smith v. Berryhill*, 139 S. Ct. at 1772. A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

### C.    Evaluation Process

#### 1. Burden of Proof

A claimant is "disabled" as defined in the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A). A sequential five-step inquiry is used to determine whether a claimant is disabled. The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520I.

"The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d at 461; *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

### 2. Pain

The Court recognizes that pain can constitute a disabling impairment, but only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment. *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985). Subjective complaints, such as complaints of pain, must be corroborated by objective medical evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

### 3. Residual Functioning Capacity

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)). The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations. *Martinez v. Chater*, 64 F.3d at 176. The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has

had an opportunity to observe whether the person seems to be disabled. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983). In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. *Giles v. Astrue*, 433 F. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

D.     **The ALJ's Findings and Conclusions**

The ALJ made the following findings:

- At step one, that Claimant has not engaged in substantial gainful activity from her alleged onset date of October 10, 2019. (Rec. Doc. 9-1, pp. 18). This is supported by substantial evidence in the record.

- At step two, that Claimant had the following severe impairments: osteoarthritis, degenerative joint disease, and degenerative disc disease (20 CFR 416.920(c)) which significantly limit the ability to perform basic work activities as required by SSR 85-28. The ALJ further found that Claimant's "impairments of hypertension and chronic obstructive pulmonary disease (COPD) are not severe, as medications appear to control any symptoms, and they cause no more than minimal limitations in the ability to perform work activity." (Rec. Doc. 8-1, p. 18). Claimant does not challenge this finding.

- At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  The ALJ further stated that he "considered Listing 1.00 *et seq.* but finds the claimant does not have stenosis resulting in compromise of a nerve root or the cauda equine. Further, the claimant does not require an assistive device that would affect her ability to use the upper extremities." (Rec. Doc. 9-1, pp. 18, 19).  To the extent that Claimant alleges that the ALJ failed to acknowledge her use of a cane, Claimant challenges this finding.

- The ALJ found that Claimant has the residual functional capacity to perform light work except she is limited as defined in 20 CFR 416.967(b), with the following additional limitations: "no more than occasional climbing of ramps or stairs; never climbing of ladders, ropes or scaffolds; frequent balancing; and occasional stooping, kneeling, crouching, or crawling." (Rec. Doc. 9-1, pp. 18, 19).  Claimant challenges this finding.

- At step four, the ALJ found that Claimant has no past relevant work. Claimant does not challenge this finding.

- At step five, the ALJ found that Claimant was not disabled from October 10, 2019, through the date of the decision because there are jobs in the national economy that she can perform.  (Rec. Doc. 9-1, p. 21).  Claimant challenges this finding.

The ALJ also found that Claimant was born on July 19, 1968, and was 51 years

old, which is defined as an individual closely approaching advanced age, on the date

the application was filed (20 CFR 416.963) and that Claimant has a limited education

(20 CFR 416.964). (Rec. Doc. 9-1, p. 22).

In assessing the nature, severity, and functional effects of Claimant's

impairments, the ALJ found

> that the claimant's medically determinable impairments could
> reasonably be expected to cause some of the alleged symptoms; however,
> the claimant's statements concerning the intensity, persistence and
> limiting effects of these symptoms are not entirely consistent with the
> medical evidence and other evidence in the record for the reasons
> explained in this decision.

(Rec. Doc. 9-1, p. 21).

The ALJ further noted:

> While the claimant has medically determinable impairments that could
> reasonably account for her asserted limitations, they are not so severe
> that they are disabling. Though she took a number of medications
> (Exhibits 6E, 6F & 7F), she denied any side effects from them (Exhibits
> 1A & 6E). She testified that medications, to include injections, did not
> help her symptoms, but there is no such assertion to treating sources.
> She testified that she could stand and walk for no more than 10 minutes,
> and lift no more than small bags; however, in her Function Report, she
> indicated she could "maybe lift 20 pounds" and later, "not lift over 40
> pounds" (Exhibit 6E). Notably, she reported that she had fractured her
> foot approximately a month before the hearing, and she was using
> crutches at the time, which could have altered her belief in her ability
> to function. She testified that she does not drive but it was because she
> could not afford a vehicle. Despite her assertions, her back improved
> with surgery, and if she would comply with therapy, her pain level would
> lessen (Exhibit 3F).

(Rec. Doc. 9-1, p. 21).

The ALJ found the opinion of the State agency medical consultants who opined

Claimant "could perform light exertional work with occasional climbing of ramps and

stairs; never climbing of ladders, ropes or scaffolds; frequent balancing; occasional stooping, kneeling, crouching, and crawling because of the degenerative disc disease and osteoarthritis of the knee" consistent with the impairments supported by the evidence and Claimant's subjective symptoms and thus, persuasive. *Id.*

<u>Claimant's Allegations of Error</u>

1. **The ALJ's RFC analysis failed to consider Claimant's need for her medically required cane.**

2. **The ALJ failed to consider whether Claimant is illiterate under § 20 C.F.R. 416.964(b)(1).**

3. **The ALJ failed to evaluate non-examining state agency medical consultant Emily Eisenhauer's opinion in accordance with the regulations.**

4. **Claimant's case, at minimum, should be remanded for an award of SSI because she now meets Rule 202.01.**

<u>Analysis</u>

As discussed above, despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. *Joubert v. Astrue*, 287 F. App'x 380, 382 (5th Cir. 2008). In doing so the Court finds the following significant:

1. <u>Claimant's use of an Assistive Device</u>

In this instance, the ALJ stated that "the Claimant does not require an assistive device that would affect her ability to use the upper extremities." (Rec. Doc. 9-1, p. 19). Claimant argues that the ALJ failed to acknowledge Claimant's reliance on "her medically required cane" and failed to consider the effect that Claimant's use of the cane would have on her ability to perform light work. (Rec. Doc. 12, pp. 4, 5).

Claimant asserts that pursuant to SSR 96-9p, an ALJ is required to incorporate use of a cane into an RFC if it is medically necessary and that at the light exertional level, (where claimants generally lift 20 pounds occasionally and 10 pounds frequently SSR 83-10), the need for a hand-held assistive device may impact the individual's functional capacity because one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling. 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.00(C)(6). *Id*.

Claimant further asserts that her required use of the cane is medically documented by FNP Jarrell in May 2020 when she stated that Claimant was to continue use of the cane for safety, as she had difficulty with balance and that Claimant testified that she has fallen "four or five times" over the previous year. *Id*. The Commissioner argues that Claimant failed to show that the cane was prescribed, much less medically required and that Claimant relies only "on a note from a May 2020 '*telephone visit only*' with Nurse Practitioner (NP) Lauren Jarrell that the plan was to 'continue use of cane for safety'" and a reference from FNP Smith in March 2022 that Claimant had a cane. (Rec. Doc. 16, p. 3) (emphasis in original). The Commissioner further asserts that SSR 96-9p requires documentation of the need for a hand-held assistive device to aid in walking or standing, and describes the circumstances for which it is needed.

The record reveals the following medical documentation of Claimant's cane usage:

- <u>November 28, 2018</u> –Physical therapist Taylor noted that Claimant continued to "ambulate with an antalgic gait with single cane support."

(Rec. Doc. 533).

- <u>December 19, 2018</u>, FNP Myers prescribed a walking cane for Claimant. (Rec. Doc. 9-1, pp. 680).
- <u>June 4, 2019</u> – NP Rubino noted that Claimant was "walking with a cane because she feels her legs give out on her." (Rec. Doc. 9-1, pp. 263-266).
- <u>May 11, 2020</u> – FNP Jarrell noted that Claimant should elevate the knee, use a knee sleeve when walking, and to continue use of a cane for safety. (Rec. Doc. 9-1, p. 698).
- <u>March 22, 2022</u> – Claimant sought follow-treatment for hypertension and complained of left knee pain. FNP Smith noted that Claimant "uses a cane to ambulate" and takes Gabapentin. She ordered x-rays and prescribed Toradol. (Rec. Doc. 9-1, pp. 731-732).

In addition to Claimant's testimony regarding falling, there is also medical evidence of at least three falls, including from an office visit at St. Landry Family Healthcare on December 3, 2019 and emergency room visits in May 2021 and June 2022. (*See* Medical Records above). It is clear that, at least as early as November 2018, Claimant was using a cane for support. However, the ALJ does not address Claimant's cane usage in the decision and does not address whether this cane usage would impact Claimant's ability to do light work.

In addition, the ALJ noted that Claimant reported that she had fractured her foot approximately one month before the hearing, that she was using crutches at the time, and asserted that this "could have altered her belief in her ability to function." (Rec. Doc. 9-1, p. 21). The ALJ made this assumption without questioning Claimant regarding her crutches or any other assistive devices.

2. <u>Lack of In-Person Observation by ALJ</u>

Due to the extraordinary circumstances associated with COVID-19, the hearing before the ALJ was held by phone two years and ten months after Claimant filed her application for benefits. While the Court is aware of the need for telephone

hearings and that Claimant agreed to the telephone hearing, the Court is also aware that certain observations and assessments cannot be made over the telephone. In this instance, the ALJ stated that the Claimant does not require an assistive device that would affect her ability to use the upper extremities. As stated above, there is ample evidence in the record regarding Claimant's cane usage. The ALJ does not address this fact in the decision. The ALJ found "Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record." (Rec. Doc. 9-1, p. 21). While it is within the ALJ's province to determine credibility, in this instance an in-person observation of Claimant would shed light on this discrepancy.

   3. <u>Lack of Medical Evidence</u>

The ALJ found the state examiner's May 5, 2020, opinion consistent with the impairments supported by the evidence and Claimant's subjective symptoms and were, as such, persuasive. Dr. Emily Eisenhauer and Disability Adjudicator/Examiner Desirae Taylor evaluated Claimant's records and found her capable of "light work" and that "the medical evidence shows that while you have limitations to your ability to work related to back and knee problems, you are still able to perform work that does not require extended standing and walking…" (Rec. Doc. 9-1, p. 65). Claimant's knee issues began in December of 2019. The bulk of Claimant's medical records which document referrals to orthopedic specialty doctors, orthopedic doctors' appointments, physical therapy sessions, emergency room visits due to falls which are allegedly the result of knee problems and/or radiculopathy due

to back issues, and continued use of Gabapentin for pain occurred after the state agency's opinion.  There are no other assessments by state examiners after May 5, 2020.

The ALJ also assumed that "despite [Claimant's] assertions, her back improved with surgery, and if she would comply with therapy, her pain level would lessen (Exhibit 3F)." (Rec. Doc. 9-1, p. 21).  The ALJ cites Claimant's records from physical therapy sessions but fails to include Claimant's reported difficulty with transportation and her requests to be discharged from therapy due to back pain. (Rec. Doc. 9-1, pp. 427, 428).

When there is no opinion evidence in the record from a medical professional regarding the claimant's ability to work and the only evidence regarding the claimant's ability to work comes from the claimant himself, the ALJ's conclusion regarding the claimant's residual functional capacity is not supported by substantial evidence. *Ripley v. Chater*, 67 F.3d at 557.  While an ALJ may choose to reject a doctor's opinions, "[s]he cannot independently decide the effects of Plaintiff's ... impairments on [her] ability to work." *Hilts v. Comm'r,* 2019 WL 477310 at *7 (W.D. La. 2019). Consistently, "an ALJ may not – without the opinions from medical experts – derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Williams v. Astrue*, 355 Fed. App'x 828, 832 n.6 (5th Cir. 2009) (citing *Ripley v. Chater*, 67 F.3d at 557).

The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. *Ripley*, 67 F.3d at 557. If the ALJ does not satisfy his duty, his decision is not substantially justified. *Id*. Reversal of his decision, however, is appropriate only if the applicant shows prejudice. *Id*. The record contains ample evidence of Claimant's physical issues including evidence of use of a cane, ambulatory issues, and falling. The record also contains ample evidence that Claimant sought treatment for pain, was prescribed medication for these issues, and continuously used this medication.

The ALJ concluded that Claimant did not use an assistive device, that her use of crutches at the time of the hearing could have altered her belief in her ability to function, and that despite her assertions, her back improved with surgery, and if she would comply with therapy, her pain level would lessen. The ALJ found that the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence. The ALJ relied on opinions of state examiners who did not observe Claimant and could not review Claimant's medical records after May 5, 2020. The ALJ did not observe Claimant and did not request an updated medical evaluation by the state examiner, a medical source statement from Claimant's treating physician, or a consultative examination.

In sum, on the present record, the court is constrained to find that the ALJ's RFC is not supported by substantial evidence. Because the foundation for the ALJ's step four, and alternative step five, decision was premised upon an RFC that is not supported by substantial evidence, the court further finds that the ALJ's ultimate

conclusion that Claimant is not disabled is likewise not supported by substantial evidence.

## Conclusion and Recommendation

For the reasons fully discussed above, this Court recommends that the Commissioner's decision be reversed and remanded for additional proceedings. In these additional proceedings, the evidence regarding Claimant's use of a cane and its impact on her ability to work should be considered, Claimant's subjective complaints of pain should be evaluated, and a report regarding the impact of Claimant's condition upon her ability to work should be obtained from a treating physician and should be reviewed before a determination of Claimant's eligibility for disability benefits is made.

* * * * *

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.

Signed at Lafayette, Louisiana on this 19th day of August, 2024.

_____

DAVID J. AYO
UNITED STATES MAGISTRATE JUDGE